Agnes JOHNSON, as personal representative of the Estate of Warren Johnson, deceased, Respondent,

v.

**FARMERS AND MERCHANTS STATE BANK OF BALATON, et al.,** Appellants,

**Minnesota Mutual Life Insurance Company, Defendant.**

No. 51512.

Supreme Court of Minnesota.

June 25, 1982.

Rehearing Denied Aug. 3, 1982.

Blethen, Gage, Krause, Blethen, Corcoran, Berkland & Peterson and Kelton Gage, Mankato, for appellants.

Barna, Guzy, Merrill, Hynes & Giancola, James W. Reuter and Miggie E. Cramblit, Fridley, for respondent.

Erickson, Zierke, Kuderer, Myster & Madsen and Gary G. Wollschlager, Fairmont, amicus curiae for Northwestern Nat. Life Ins. Co.

KELLEY, Justice.

Appellants, Farmers and Merchants State Bank of Balaton (Bank), Balaton Agency, Inc. (Agency) and V. G. Schaffer (Schaffer) appeal from an order of the trial court dated June 11, 1980, denying their motion for Amended Findings of Fact, Conclusions of Law and Order for Judgment, or in the alternative, for a new trial. We affirm in part and reverse in part.

Respondent Agnes Johnson, the widow of Warren Johnson, commenced this action against appellants alleging (1) that appellant Bank had made misrepresentations to Warren Johnson during his lifetime relating to line of credit life insurance; (2) that the Bank had breached a fiduciary duty to the deceased; (3) that the Bank had charged Warren Johnson usurious interest on various loans; and (4) that the Bank had violated the Truth in Lending Act, 15 U.S.C. § 1639 (1976) and Regulation Z, 12 C.F.R. § 226.8 (1976) with respect to a note dated January 27, 1977. As against appellants Schaffer and Agency, the complaint alleged negligence in failing to provide Warren Johnson with adequate line of credit life insurance to cover his debts to the Bank. Respondent further sought punitive damages against Schaffer and Agency for the intentional infliction of emotional distress.[1]

In answers to interrogatories on a special verdict, the jury found (1) that appellants Agency and Schaffer were negligent in their dealings with Warren Johnson in regard to line of credit life insurance on his life; (2) that the Agency failed to deliver a "line of credit" insurance policy or certificate of insurance issued on the life of Warren Johnson to him; and (3) that Warren Johnson was negligent in regard to the line of credit life insurance on his life up until the time of his death in 1977. The jury then found the decedent, Warren Johnson, was 24% causally negligent; that Agency and Schaffer were 75% causally negligent; and that Minnesota Mutual Life Insurance Company, the company which issued the line of credit life insurance policy, was 1% causally negligent.[2] The trial court ordered judgment on the negligence claims against Agency and Schaffer in the amount of $55,331, representing 76% of the difference between the line of credit life insurance of $40,000 on the life of Warren Johnson and his total indebtedness to the Bank at the time of his death. The court also awarded judgment against the appellant Bank in the amount of $1,000, representing twice the interest charged on the January 27, 1977

1. Before or during trial, the trial court dismissed the claim for punitive damages, the claims for breach of fiduciary duty and misrepresentation, and ruled that the usury and truth in lending claims would be decided by the court.

2. Originally, Minnesota Mutual Life Insurance Company was a party defendant. In its Findings of Fact, Conclusions of Law and Order for Judgment, the trial court dismissed the action against Minnesota Mutual and added its 1% causal negligence to that of appellants Agency and Schaffer. In addition, the trial court found that appellant Bank had not committed usury, and that appellant Bank had violated the Truth in Lending Act in connection with the January 27, 1977 note.

bank note plus $1,250 attorneys fees for violation of the Truth in Lending Act.[3]

Appellants assert (1) lack of sufficient evidence to sustain the court's findings of fact and conclusions of law with respect to the negligence claim against Schaffer and the Agency; (2) that the trial court erred in finding a violation of the Truth in Lending Act in connection with the January 27, 1977 note and in computing damages thereon; and (3) that the court erred in evidentiary rulings (a) admitting statements made by decedent prior to his death to third persons, (b) admitting statements of various residents of the Balaton community on appellant Schaffer's "community reputation" as opposed to his reputation for "truth and veracity," (c) admitting evidence with respect to "overline" loans, and (d) in excluding evidence offered by appellants concerning activities of respondent and her son in furnishing copies of pleadings to local newspapers for the purpose of injuring the appellant Schaffer.

Warren Johnson was a successful farmer and livestock feeder in the Balaton, Minnesota community. He commenced farming in the early 1950's and built up his farming operation by increasing his personal property, modernizing and improving his farm buildings, and by acquiring additional farm land. He was actively involved in community affairs during his life, serving on his town board, serving as president of the local elevator board and as treasurer of the school district board. Although he had a limited formal education, he was an intelligent, strong-willed man who understood money problems. Warren Johnson died in a tractor rollover accident in July 1977 when he was 56 years of age.

Appellant Schaffer and his wife own all of the stock in Balaton Insurance Agency which, in turn, owns 97% of the stock in the Bank. Schaffer is the president of both corporations. The business of both corporations is done in the same building, and the employees of the Bank are also employees of the Agency.

Since the early 1950's, Warren Johnson had been a regular customer of the Bank. During that time, he had borrowed close to half a million dollars in over 70 separate transactions. In the spring of 1973, Warren Johnson owed the Bank approximately $40,000. At that time, he purchased a Minnesota Mutual Life Insurance Company line of credit policy from the Agency.[4] This policy insured Johnson's life with the Bank named as an irrevocable beneficiary.[5] "Line of credit" insurance differed from credit life insurance in that, on death, proceeds of the former would be applied toward payment of all loans the debtor had with the bank up to the policy limits, whereas the latter insured payment only of a specific loan. The purchaser of a line of credit policy did not receive a policy. Instead, the insurer—here Minnesota Mutual—issued a certificate of insurance to which a copy of the application was attached. The application for this line of credit insurance was for $40,000, which Johnson signed at the time of purchasing the insurance in 1973. At that time he also signed a check for the premium which had a notation on it, "$40,000 Life—1 yr."

In 1976, Johnson purchased his sister's half-interest in the family farm. An officer of the Bank suggested to him that he increase his line of credit insurance. He declined and indicated that the $40,000 policy he bought in 1973 was adequate because his

---

**3.** The trial court also ordered certain adjustments to be made in principal and interest on notes of Warren Johnson at the Bank. Appellants have not raised any issue with respect to those findings of fact or conclusions of law in post-trial motions or on this appeal.

**4.** At that time, the maximum amount of line of credit life insurance available from Minnesota Mutual through the Agency was $50,000. In 1975 and later, a bank customer could have purchased line of credit insurance from Minnesota Mutual through the Bank up to a maximum of $100,000.

**5.** If, at the time of Johnson's death, his debt to the Bank equalled or exceeded $40,000, the face amount of the policy, all insurance proceeds from the policy would be paid to the Bank and by it applied on his debts to the Bank. If the amount of debt was less than $40,000, the debt would first be paid off at the Bank with the remaining balance going to contingent beneficiaries.

wife could liquidate the personal property and still have the land unencumbered. Again, in 1977, Schaffer talked with Johnson about his line of credit insurance. But again Johnson declined to purchase more insurance. In 1976, the Bank (or the Agency) sent Johnson a premium notice. This notice showed an increase in premium. Upon receipt of the same, Johnson came to the Bank to inquire why the premiums were higher than they had been in prior years. An officer of the Bank ascertained that the increase was due to an age change,[6] and wrote Johnson a memorandum of explanation which, on its face, recited that the amount of the Minnesota Mutual Life Insurance Company line of credit policy was $40,000.

At the time of his death, Johnson owed the Bank $116,646.78 in principal and interest on various loans and notes. Respondent claims that an employee of the Bank and Agency, William Emerson, had assured Johnson in 1973, when the latter bought the line of credit insurance, that the policy was a "blanket policy" covering all of Johnson's bank debts. Shortly after Johnson's death, respondent and one or more of her sons went to the Bank to talk to Schaffer. They then learned there was only $40,000 in proceeds from the line of credit policy to apply on the decedent's debts. Respondent was unable to find a line of credit policy, an application therefor, a certificate of insurance or any correspondence from the Bank or Agency containing evidence of policy limits in her personal and farm records.

At trial, Emerson admitted he may have used the term "blanket policy" when the insurance was sold in 1973, but contended he explained to Johnson that the policy would blanket all debts he owed to the Bank at the time of his death up to the face amount of the policy, which was $40,000.

Over strenuous objection, respondent was permitted to introduce in evidence statements made by the deceased to her as well as statements made by him to others to the effect that he, Johnson, believed that all his debts to the Bank were covered by a "blanket policy." Appellants contend the statements of Johnson were hearsay and not admissible under any exception to the hearsay rule.

The following issues are raised by the appeal:

1. Did the evidence support the jury's special verdict, adopted by the trial court in its findings, on the negligence claims against Schaffer and the Agency?

2. If there was evidence to support the verdict, did the trial court commit error in admitting evidence with respect to (a) Johnson's statements to his wife and others; (b) statements of witnesses concerning appellant Schaffer's "community reputation" as opposed to his reputation for "truth and veracity"; (c) appellant Bank's "overline" loans, recordkeeping and delivery of insurance policies to customers of the Bank other than Johnson?

3. Did the trial court err in ordering recovery from appellants Agency and Schaffer in an amount greater than the maximum amount of line of credit life insurance obtainable by decedent from the Bank during his lifetime?

4. Was the January 27, 1977 note executed by the decedent to the Bank exempted from the Truth in Lending Act?

1. If the evidence did not sustain the jury's verdict and the trial court's findings of fact on the negligence question, it is, of course, unnecessary to consider issues 2(a), (b), (c) and 3. Respondent claims negligence on the part of the Agency and Schaffer in issuing and delivering the policy and in failing to review the policy coverage with Johnson annually when he came in to renew his line of credit.

In reviewing jury verdicts, this court has only a limited role. All testimony must be considered in the light most favorable to the prevailing party below. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252 (Minn. 1980); *Blasing v. P.R.L. Hardenbergh Co.*,

---

**6.** "Line of credit" life insurance was term insurance. The premiums increased periodically as the insured aged.

303 Minn. 41, 226 N.W.2d 110 (1975); *Krengel v. Midwest Automatic Photo, Inc.*, 295 Minn. 200, 203 N.W.2d 841 (1973). A verdict will only be disturbed if it is manifestly and palpably contrary to the evidence. *Carpenter v. Mattison*, 300 Minn. 273, 219 N.W.2d 625 (1974); *Young v. Hansen*, 296 Minn. 430, 209 N.W.2d 392 (1973).

■ Respondent's first contention is that appellants Agency and Schaffer failed to deliver the policy—here actually the certificate of insurance with the application attached—to Johnson in 1973 when he first acquired the line of credit insurance. Respondent claims Minn.Stat. § 62B.06 (1980) was violated by such failure of delivery, that such failure to deliver contrary to the requirements of the statute was negligence, and that such negligence directly caused respondent's loss on Johnson's death.

Respondent had the burden of proving non-delivery. Respondent submitted very little evidence to establish non-delivery. All that was shown was that following Johnson's death, family members could not find the policy, certificate of insurance or application form,[7] plus the fact that the creditor Bank sometimes kept such documents.[8] Consistent with the rules discussed above, we accept the jury's verdict of non-delivery on this appeal. Because the jury found no delivery, there was a violation of section 62B.06.

■ The question, then, is whether such violation established negligence as claimed by respondent. Not every statutory violation is negligence. We have held that a violation of a legislative enactment can be evidence of negligence if (1) the intent of the statute is to protect a class of which plaintiff is a member, but only if (2) the plaintiff's injury involves an invasion of the particular interest protected by the statute,

(3) was caused by the particular hazard or form of harm against which the enactment was designed to give protection and (4) it was proximately caused by its violation. *Standafer v. First National Bank of Minneapolis*, 236 Minn. 123, 52 N.W.2d 718 (1952); *Hondl v. Chicago Great Western Railway Co.*, 249 Minn. 306, 82 N.W.2d 245 (1957); *LaBelle v. Swanson*, 248 Minn. 35, 78 N.W.2d 358 (1956). *See also* Restatement (Second) of Torts § 286 (1965).

■ The intent of section 62B.06 is to assure that the borrower will receive the benefit of insurance for which he has applied. Subdivision 4 of the statute penalizes a lending creditor who fails to deliver a copy of the policy, certificate or application to the borrower by making it an insurer to the extent of the coverage for which application has been made. Under subdivision 5, an insurer who fails to send a policy, certificate or application loses all rights to decline the risks. Examination of the statute fails to show any implication that non-delivery of the policy, certificate or application shall constitute the basis of negligence claims to create coverage in excess of what the borrower-insured actually purchased. Because the line of credit policy has been paid in the amount applied for by Johnson, the purpose of the statute in this case has been satisfied. Even though there was non-delivery in violation of the statute, such violation does not establish or constitute actionable negligence. For the same reason, the Johnsons' injury does not involve the particular interest protected by the statute, to-wit, to get the insurance applied for, nor was the respondent's injury caused by the failure to make delivery. In 1973 and subsequently, Johnson knew he had applied for $40,000 line of credit life insurance and, in several

---

7. It is perhaps significant they could not find similar documents concerning a $5,000 life insurance policy taken out by the deceased in the 1950's and which he owned at the time of his death.

8. Actual delivery to the insured of the policy— or certificate of insurance with application attached—is not always necessary to create a binding insurance contract. Constructive delivery, such as mailing the insurance document

by the company to the agent or creditor is sufficient if the insurer manifested its assent to the consummation of the insurance contract. *Wanshura v. State Farm Life Insurance Co.*, 275 N.W.2d 559 (Minn.1978). Here there was such assent. The insurer, Minnesota Mutual Life Insurance Company, has never denied there was a life insurance contract, and, in fact, paid off the face amount of the policy ($40,000) on the occasion of Johnson's death.

succeeding years, had paid the premium for that amount. He would have known nothing more had he been furnished with a certificate of insurance; nor was he damaged, within the import of the statute, by failure of delivery. His estate received what he applied and paid for, which is what the statute sought to ensure.

■ In our view, there was likewise no evidence to sustain the jury's verdict on the grounds that Schaffer or Agency failed to review Johnson's line of credit policy with him periodically, and that such failure was negligence. An insurance agent has the duty to exercise the standard of skill and care that a reasonably prudent person engaged in the insurance business will use under similar circumstances. 43 Am.Jur.2d *Insurance* § 173 (1969); Annot., 72 A.L. R.3d 735, 738 (1976); Annot., 72 A.L.R.3d 747, 754 (1975); Annot., 64 A.L.R.3d 398, 404–5 (1975). In the absence of a contractual undertaking by the agent or broker to provide insurance, the agent or broker has no legal duty toward an insured beyond that specifically undertaken by him or her. *Collegiate Manufacturing Co. v. McDowell's Agency, Inc.*, 200 N.W.2d 854 (Iowa 1972). Here, the undertaking by Schaffer and the Agency was to procure line of credit life insurance for Johnson in the amount of $40,000. That they did. Even assuming that in 1973 the Agency had a duty to provide "blanket coverage" for Johnson's debt to the Bank, it is clear that duty was fulfilled inasmuch as Johnson's indebtedness to the Bank generally was in the

neighborhood of $40,000 until 1976, when he purchased his sister's half-interest in the farm. The uncontradicted evidence is that at the time Schaffer urged Johnson to purchase additional line of credit life insurance which Johnson declined to do. Even if there were some duty on the part of the Agency to review the insurance coverage annually or periodically, here any failure of periodical review is clearly not the cause of any damages sustained by the respondent because Johnson, at all times, knew he had line of credit life insurance to the maximum amount of $40,000.

From a careful examination of the extensive record, we are of the view that there was no evidence to sustain the jury verdict, adopted by the trial court as part of its findings, that Schaffer and Agency were causally negligent. Accordingly, issues 2(a), (b), (c) and 3 need not be addressed.

■ 4. Appellant Bank claims that the trial court erred in finding that a note executed by decedent on January 27, 1977, was not exempt from the Truth in Lending Act and regulations issued pursuant thereto.[9] Appellants concede that the disclosures by the Bank were inadequate to comply with the statute and the regulation. However, appellant Bank claims the note was an exempted agricultural credit transaction under 15 U.S.C. § 1603(5) (1976) and Regulation Z, 12 C.F.R. § 226.3 (1976). Appellant Bank claims exemption because the note was one of a number of notes issued pursuant to a $40,000 line of credit established by the Bank for Johnson for general

---

9. Required disclosures under the Truth in Lending Act are found in 15 U.S.C. § 1639 (1976):

(a) Any creditor making a consumer loan or otherwise extending consumer credit * * shall disclose each of the following items, to the extent applicable:

(1) The amount of credit of which the obligor will have the actual use, or which is or will be paid to him or for his account * * *.

(2) All charges, individually itemized, which are included in the amount of credit extended but which are not part of the finance charge.

(3) The total amount to be financed (the sum of the amounts referred to in paragraph (1) plus the amounts referred to in paragraph (2)).

* * * * * *

(5) The finance charge expressed as an annual percentage rate * * *

* * * * * *

(6) The number, amount, and the due dates or periods of payments scheduled to repay the indebtedness.

(7) The default, delinquency, or similar charges payable in the event of late payments.

* * * * * *

(b) Except as otherwise provided in this part, the disclosures required by subsection (a) of this section shall be made before the credit is extended, and may be made by disclosing the information in the note or other evidence of indebtedness to be signed by the obligor.

*See also* Regulation Z, 12 C.F.R. § 226.8 (1976).

agricultural purposes.[10] Accordingly, appellant Bank alleges that the trial court erred in awarding respondent judgment against it for $1,000 plus $1,250 in attorneys fees.

■ On March 23, 1976, Johnson signed a note and security agreement establishing a $40,000 line of credit. Shortly thereafter, $32,600 of the $40,000 line of credit had been advanced by "renewal of line" and for "operating" expenses. Thus, only $7,400 of the March 23, 1976 credit line remained for future advances. Between that date and January 27, 1977, Johnson executed other notes totaling $15,000 for "operating" purposes. Moreover, during that interval Johnson repaid no notes. The new notes exhausted the March 23, 1976 line of credit and, indeed, substantially exceeded it. The trial court therefore correctly concluded that the $10,500 note of January 27, 1977 was a single credit transaction and not ex-empted by 15 U.S.C. § 1603(5) (1976) or Regulation Z, 12 C.F.R. § 226.3 (1976). Moreover, the trial court correctly awarded respondent damages and attorneys fees. Penalties to be assessed a creditor for violation of the Truth in Lending Act are found in 15 U.S.C. § 1640 (1976).[11] The statute provides damages shall be the equivalent of double the amount of the finance charge in connection with the transaction together with reasonable attorneys fees as determined by the court. The trial court's judgment on this issue conforms with the statutory formula.

Affirmed in part; reversed in part.

---

10. In 1977, 15 U.S.C. § 1603(5) (1976) exempted "[c]redit transactions primarily for agricultural purposes in which the total amount to be financed exceeds $25,000." Regulation Z, 12 C.F.R. § 226.3(e) (1976) provides:

Credit transactions primarily for agricultural purposes, including real property transac-tions, in which the amount financed exceeds $25,000 or in which the transaction is pursuant to an express written commitment by the creditor to extend credit in excess of $25,000 * * *. (footnote omitted)

11. The Bank is a "creditor" within the meaning of the Act. 15 U.S.C. § 1602(f) (1976).