Cary **FEMRITE**, et. al., **Appellants,**

v.

**ABBOTT NORTHWESTERN HOSPITAL, Respondent.**

No. C9–97–586.

Court of Appeals of Minnesota.

Sept. 9, 1997.

Review Denied Nov. 18, 1997.

Ronald S. Goldser, Keelyn M. Friesen, Zimmerman Reed, P.L.L.P., Minneapolis, for appellants.

Rebecca L. Egge Moos, Gregory W. Deckert, Bassford, Lockart, Truesdell & Briggs, Minneapolis, for respondent.

Considered and decided by TOUSSAINT, C.J., and LANSING, HUSPENI, RANDALL, NORTON, PETERSON, HARTEN, WILLIS and SCHULTZ *, JJ.

## OPINION

HARTEN, Judge.

Appellants challenge adverse summary judgment on various tort claims arising from injuries allegedly incurred as a result of spinal fusion surgery. We affirm.

## FACTS

Appellants Cary Femrite and Ruth Perkl underwent spinal fusion surgery that involved implantation with pedicle screw devices at respondent Abbott Northwestern Hospital (Abbott). In December 1989, Femrite was implanted with a screw device known as the "VSP" or "Stefee" system manufactured by AcroMed. In February 1990, Perkl was implanted with a screw device known as the "Cotrel Dubousset" manufactured by Sofamor Danek.[1]

At the time of surgery, neither appellant was informed that the surgery was experimental or that implantation of the screw device in pedicles was investigational. Both appellants experienced complications and medical problems after receiving the implants.

The Food and Drug Administration (FDA) approves surgical devices by one of two methods before lawful marketing: (1) premarket notification, the 510(k) application, whereby manufacturers demonstrate that a device is substantially equivalent to other devices marketed prior to the enactment of the medical device amendment on May 28, 1976, or (2) premarket approval, which is required for all post-amendment devices with no marketing experience prior to May 28, 1976. *See* 21 C.F.R. § 814.1(a), (c) (1996).

To obtain premarket approval, a manufacturer must submit extensive preclinical and clinical data to the FDA demonstrating that the device is safe and effective.

To enable a manufacturer to obtain necessary clinical data for FDA premarket approval, the FDA grants an Investigational Device Exemption (IDE), which permits a device (that would ordinarily require premarket approval) to be "shipped lawfully for the purpose of conducting investigations of that device." 21 C.F.R. § 812.1(a) (1996). An "investigation" is defined as "a clinical investigation or research involving one or more subjects to determine the safety and effectiveness of a device." 21 C.F.R. § 812.3(h) (1996). A hospital may not initiate investigational studies under an IDE without approval and oversight by a hospital's institutional review board (IRB). 21 C.F.R. §§ 56.103 (1997) (requiring IRB for clinical investigations under 21 C.F.R. § 812 and § 813); 812.20 (1996) (setting forth application process for clinical study of investigational device). An IRB is a committee designed to review biomedical research involving patients. 21 C.F.R. § 812.3(f).

In 1985, AcroMed (one of the companies whose product is involved in this litigation) applied for 510(k) approval of its screw device for spinal fixation. At that time, the FDA denied the application for 510(k) approval of the screw device and classified it as a Class III device under 21 U.S.C. § 360c(a)(1)(C) (1994) (a section of the Food, Drug, and Cosmetic Act or FDCA). Following the FDA's denial of 510(k) approval to market the screw device for spinal fixation, AcroMed submitted 510(k) notification to the FDA, changing the screw device name to "nested bone plate." In 1986, the FDA approved the screw device for long and flat bones, such as those in arms and legs.

The "pedicles" of the spine are boney arches on either side of the spinal cord that connect the front of the vertebral body to the bones around and behind the spinal cord. The devices used in these cases consist of a surgical steel plate or rod, which runs lengthwise along the affected vertebrae and is attached with a screw that runs through the pedicle into the vertebrae.

---

\* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. Surgeons use surgical stainless steel implants to fuse vertebrae by affixing hardware directly to the spine via hooks and wires, or, as here, screws. The screw device immobilizes adjacent vertebrae giving them an opportunity to fuse.

After the FDA approved the screw device for use in long and flat bones, surgeons began "off label" use of it in spinal surgeries. In 1995, the FDA, for the first time, granted 510(k) approval of the screw devices for use in patients with severe spondylolisthesis, a serious spinal disability.

Appellants commenced this action [2] against Abbott, alleging (1) negligence, (2) negligence per se for violation of the FDCA, federal regulations, state law, and internal hospital policy, (3) corporate negligence, (4) fraudulent concealment, and (5) strict liability in administrative services. Appellants contended that Abbott is liable for allowing physicians to perform pedicle implantation of the screw devices when such devices were not FDA-approved. After a hearing, the district court granted Abbott's motion for summary judgment on all claims. This appeal followed.

## ISSUES

1. Did the district court err in determining that the statute of limitations did not expire on appellants' claims?

2. Did the district court err in granting summary judgment to Abbott on:

(a) appellants' negligence per se claims?

(b) appellants' corporate negligence and fraudulent concealment claims?

3. Did the district court err in determining that appellants failed to present a prima facie case of strict liability in administrative services?

## ANALYSIS

On appeal of summary judgment, we determine whether any genuine issues of material fact exist and whether the district court erred in its application of the law. *Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 112 (Minn.1992). The nonmoving party bears the burden of coming forth with sufficient facts to raise a genuine issue of material fact for trial. *Nicollet Restoration, Inc. v. City of St. Paul*, 533 N.W.2d 845, 848 (Minn.1995); Minn. R. Civ. P. 56.05.

**2.** Although appellants filed a class action com-

### 1. Statute of Limitations

Abbott contends, as an independent basis for affirmance, that appellants' claims are barred by the statute of limitations governing medical malpractice actions. Generally, negligence actions are subject to a six-year statute of limitations under Minn.Stat. § 541.05 (1996). Minn.Stat. § 541.07(1) (1996), however, provides a two-year statute of limitations for

all actions against physicians, surgeons, * * * other health care professionals * * * and * * * hospitals * * * for malpractice, error, mistake, or failure to cure, whether based on contract or tort.

To ascertain whether the two-year statute of limitations applies, one must determine whether the action is included among those listed in the two-year statute of limitations for "malpractice, error, mistake, or failure to cure." *Kaiser v. Memorial Blood Ctr.*, 486 N.W.2d 762, 765 (Minn.1992) (quoting Minn. Stat. § 541.07(1)).

Although Abbott, as a hospital, clearly falls within the two-year statutory listing, appellants argue that the six-year statute of limitations applies because their claims against Abbott are for negligent hospital administration, rather than malpractice. Abbott counters that appellants' claims are based on malpractice because appellants' complaint alleges "physical injuries as a result of erroneous, mistaken, or improper surgeries."

The district court followed *Kaiser*, a case in which the supreme court applied the six-year statute of limitations under Minn.Stat. § 541.05 in an action against a blood bank by a patient who contracted HIV from a blood transfusion. *Kaiser*, 486 N.W.2d at 768. In *Kaiser*, the supreme court applied the six-year statute of limitations because the action, which was based on the blood bank's administrative and policy-making functions, was for common law negligence, rather than malpractice. *Id.* Under *Kaiser*, we assume, without deciding, that the six-year statute of limitations applies here because appellants' claims are for negligent administration, rath-

plaint, they have not yet been certified as a class.

er than medical malpractice. We therefore turn to the merits.[3]

## 2. Negligence Claims

Appellants argue that the district court erred when it dismissed their claims based on Abbott's alleged negligence in performing its administrative functions. Appellants contend that Abbott allowed physicians to make spinal implantation of screw devices outside an approved IDE in violation of federal law, that Abbott violated state law by failing to obtain informed consent, and that Abbott failed to comply with its own internal case management policies. All of appellants' claims, however, depend on the single premise that it was unlawful for Abbott to allow physicians to use the screw devices in appellants' spinal surgeries. Thus, our determination hinges on whether federal law limited implantation of the screw device in spinal surgeries to investigational usage or simultaneously permitted it to be implanted into spinal pedicles as an "off-label" use.

### (a) Negligence Per Se Claims
### (1) Violation of FDA Regulations

◼ Appellants contend that a viable negligence per se claim exits because Abbott violated federal regulations by allowing use of the screw devices in appellants' surgeries. Regulatory violations may constitute negligence per se if the plaintiff belongs to the class of persons that the regulation is intended to protect. *See Johnson v. Farmers & Merchants State Bank,* 320 N.W.2d 892, 897 (Minn.1982) (violation of law may be negligence per se if plaintiff is member of class that law intended to protect).[4]

> [A] violation of a legislative enactment can be evidence of negligence if (1) the intent of the statute is to protect a class of which plaintiff is a member, but only if (2) the plaintiff's injury involves an invasion of the particular interest protected by the statute, (3) was caused by the particular hazard or form of harm against which the enactment was designed to give protection and (4) it was proximately caused by its violation.

*Id.*

Appellants specifically argue that Abbott violated federal regulations by failing to ensure that medical devices were implanted in compliance with any restrictions on their use. In support of their claim, appellants submit an affidavit of Arthur Shorr, a hospital administration expert, stating that Abbott was negligent by failing to comply with applicable laws and by failing to prevent the purchase of devices that were unapproved by the FDA.

The district court determined that appellants failed to state a cause of action for negligence per se because appellants "were not participants in a clinical investigation or a research study." Appellants insist that the

---

**3.** Abbott also contends that appellants' complaint must be dismissed for failure to comply with Minn.Stat. § 145.682, subd. 2 (1996), because appellants' pleadings were not accompanied by an affidavit of expert review. Our assumption that the six-year statute of limitations applies to this case negates the need for such expert affidavit.

**4.** Abbott claims that we should affirm summary judgment on appellants' negligence per se claims for violation of the FDCA and federal regulations because only the federal government has standing to enforce these federal laws. In support of their position Abbott cites 21 U.S.C. § 337(a) (1994), which provides:

> Except as provided in subsection (b) of this section, all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States.

Abbott also cites a number of federal cases for the proposition that no private right of action exists under the FDCA. *See, e.g., Reeves v. AcroMed Corp.,* 44 F.3d 300, 307 (5th Cir.1995) (barring state law claims based on allegations that manufacturer violated FDA labeling regulations), *cert. denied,* 515 U.S. 1104, 115 S.Ct. 2251, 132 L.Ed.2d 258 (1995); *Gile v. Optical Radiation Corp.,* 22 F.3d 540, 544 (3rd Cir.1994) (no private cause of action for violation of FDCA). 21 U.S.C. § 337(a) only bars actions to "enforce" the FDCA. We are not persuaded. The cases Abbott cites hold that a plaintiff may not bring a private cause of action against a *manufacturer* for a violation of the FDA. They do not address whether the FDCA may be used to establish the applicable standard of care for private negligence claims against a hospital. Moreover, appellants' action alleging that Abbott was negligent because it failed to comply with FDA regulations is not an action to enforce the FDCA. The FDCA regulates the marketing of medical devices, not the practice of medicine.

district court's disposition of this claim "begs the question" because they contend the screw device was an investigational device that could be used only within the context of a clinical investigation.

Appellants base their contention on FDA classification of the screw device as a Class III device for investigational use only. 21 U.S.C. § 360j(e)(1) (1994) provides, "The Secretary may by regulation require that a device be restricted to sale, distribution, or use." Appellants also argue that the federal regulations promulgated pursuant to section 360j likewise restricted the use of the screw devices to investigational use. Finally, appellants allege that in order to use the screw devices here at issue, the physicians were obligated to obtain an IDE from the FDA.

To buttress their assertion that the screw devices were investigational and therefore to be used only in investigational studies, appellants allege that the FDA denied 510(k) marketing clearance to the screw device for use in spinal pedicles. Appellants assert in their brief that in 1986 the FDA cleared the screw device used in this case "for use in arms and legs, *but not for use in spines.*" But neither party submitted a copy of the purported FDA 510(k) notification restricting the use of the screw device. The only record evidence addressing FDA 510(k) approval comes from affidavits submitted by both sides; those affidavits suggest that the FDA simply approved the 510(k) notification without any specific limitation on use of the screw devices. Thus, the record is devoid of evidence to support appellants' assertion that in 1986 the FDA approved use of the screw devices for arms and legs, but specifically *prohibited* their use in spines.

Appellants also submit a 1995 FDA letter authorizing the use of the screw device as a Class III device only for patients with severe spondylolisthesis. Appellants point out that the FDA letter authorizing use of the device for spondylolisthesis indicates that other uses of the device are considered investigational and could occur lawfully only pursuant to an approved IDE. Thus, appellants suggest that if spondylolisthesis is absent, the screw device may be implanted into spinal pedicles only within clinical investigations.

Abbott, on the other hand, argues that the use of the screw devices here was an "off-label" use because the FDA had already approved the device for use in long and flat bones. Abbott contends that implantation of the screw device in spinal fixation surgeries is an "off-label" use, and as such, involves medical discretion, which is beyond FDA regulation. In *Weaver v. Reagen,* 886 F.2d 194, 198 (8th Cir.1989), the federal court recognized that "offlabel" use of medical products is widespread and appropriate. The court quoted an FDA bulletin that explained,

> Once a product has been approved for marketing, a physician may prescribe it for uses or in treatment regimes or patient populations that are not included in approved labeling.

*Id.* (quoting *Use of Approved Drugs for Unlabeled Indications,* 12 FDA Drug Bulletin 4 (April 1982)).

To support their argument that "off-label" use of the screw devices was permitted, Abbott submitted an affidavit of James Benson, former Acting FDA Commissioner and Deputy Commissioner. Benson's affidavit states that "off-label" use is a "longstanding and common practice which has been acknowledged by the FDA." Benson's affidavit also states that use of screw devices in the pedicles of the spine did not violate FDA regulations or policy as of December 1992 (when he left the FDA).

Appellants nevertheless contend that it is anomalous to suggest that the screw device could be implanted in patients within the scope of clinical investigations—which were being conducted at Abbott at the time of appellants' surgeries—and at the same time lawfully be implanted into other patients who were not participating in the investigations.[5]

---

5. The record demonstrates that Abbott's IRB—the Institutional Human Research Committee (IHRC)—approved at least two clinical studies of spinal implant devices between 1986 and 1994. The IHRC approved a research investigation involving the AcroMed VSP pedicle screw system; this study was conducted between 1986 and 1990. In 1988, the IHRC approved another research investigation involving the Wiltse pedicle screw device manufactured by Advanced Spine

Appellants deny that physicians could consider "off-label" usage to be a standard of care in some cases and simultaneously investigational in others.

■ The record, however, demonstrates otherwise. In 1986, AcroMed received 510(k) approval to market bone screws or plates as a Class II device for use in long bones such as those in arms and legs. Given that approval, physicians could permissibly implant the screw device elsewhere in the body as an "off-label" use, albeit the approval was for use in arms and legs; nevertheless, manufacturers were not permitted to *market* the device for such usage because of the 1984 and 1985 FDA classification of the device as Class III investigational for pedicle spine usage. Manufacturers of the screws and plates for long, flat bones apparently sought authority to market these products for use as *pedicle* screw devices. To that end, the same manufacturers that received 510(k) approval to market their screw device for one purpose (long and flat bones) also requested FDA approval to conduct clinical investigations in their quest for eventual FDA approval to market the same screw device as a *pedicle* screw device. Therefore, a hospital could acquire the same device from a manufacturer either through routine commercial means for "off-label" use or as an investigational device under an IDE. In opposition to Abbott's summary judgment motion, appellants submitted correspondence of Dr. Carl Larson, a medical device consultant, who described this scenario.[6] It fits the circumstances here:

Abbott conducted an investigational study on the pedicle screw devices at the same time that physicians made "off-label" use of the same type of screw device when they performed appellants' implants at Abbott outside an investigational study.[7]

■ Our conclusion that no violation of the FDCA resulted from this "off-label" use of the screw device is also supported by two FDA-letterhead documents included in the appendix of appellants' reply brief. Generally, this court will not consider evidence outside of the appellate record. *Plowman v. Copeland, Buhl & Co., Ltd.*, 261 N.W.2d 581, 583 (Minn.1977). We may, however, take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Minn. R. Evid. 201(b). Judicial notice is intended to expedite litigation by avoiding the time and expense of formally proving facts that can be established by "unquestionable sources of information." *State, Dep't of Highways v. Halvorson*, 288 Minn. 424, 430, 181 N.W.2d 473, 476 (1970). These FDA-letterhead documents are a source whose "accuracy cannot reasonably be questioned." Minn. R. Evid. 201(b). Moreover, counsel for both parties agreed at oral argument that the court may take judicial notice of these FDA documents. The documents indicate that the FDA considers use of the orthopedic screws in spinal surgeries to be a permissible "off-label" use.

---

Fixation Systems, Inc. This investigation was completed in 1994.

6. Dr. Larson's statement explains:
   [a] 510(k)'d device can be shipped across interstate lines to any facility or surgeon with labeling stating its Class II intended use. The very same device with labeling stating a Class III investigational intended use can only be shipped to investigators of an approved IDE. * * * Briefly, this marketing outside the IDE scenario described above is exactly what was instituted by the pedicle screw manufacturers during the 1984—1995 time frame, prior to some of their devices being 510(k)'d for limited use in the lumbar spine. During these years, these manufacturers submitted 510(k)s for either long bone screws, sacral screws, or other type screws with Class II intended uses and then, applied for an IDE for the exact same

device for study of its use in the pedicles of the spine.

7. This explanation is supported by the application submitted to Abbott's IRB requesting permission to conduct an investigational study on the AcroMed VSP spine plate system. The application dated 1986 submitted to the IRB stated that:

   The AcroMed VSP Bone Plates *have been approved by the FDA to be used as bone plates anywhere in the body;* AcroMed is interested in limiting the use of this device to the spine *and marketing this as a specific type of internal fixation for the spine.*
   The purpose of the study is to determine the implant's safety and efficacy as internal fixation of the spine.
   (Emphasis added.)

One document is FDA correspondence dated February 17, 1994, entitled "Update on the Regulatory Status of Pedicle Screws." This document states:

> The use of orthopedic screws approved for other purposes as "pedicle screws" by physicians is considered by FDA to be an "off-label" use—that is, using an approved device for an unapproved indication. In general, a physician who engages in off-label uses has the responsibility to be well informed about the device, and to base the decision to use it on sound medical evidence and a firm, scientific rationale.

This document also indicates that the FDA "encourages surgeons using pedicle screw devices to enroll their patients in such approved clinical investigations." There is no evidence, however, that such enrollment is required.

The other FDA document is dated December 21, 1993, and entitled "Update on Pedicle Screws." This document also indicates that use of screw devices in the spinal pedicles is a permitted use:

> Under the law, before orthopedic screws can be marketed as pedicle screws, their manufacturers must submit scientific data to FDA establishing that these devices are safe and effective for this purpose. Limited studies of pedicle screws have been ongoing for a number of years, and FDA has approved using the screws in these studies.

> \* \* \*

> In practice, surgeons often use orthopedic screws which FDA has cleared for other purposes, such as repairing long bones in the arms and legs, as pedicle screws. Such use of medical devices for non-approved purposes has traditionally been regulated by the hospitals in which the physicians practice and by their state medical boards, not by FDA.

Considering these FDA documents, and the record as a whole, we conclude as a matter of law that the physicians' implantation of the screw devices in appellants' surgeries was a permissible "off-label" use not in violation of FDA regulations. Accordingly, we affirm summary judgment on appellants' FDA regulation negligence per se claims.

### (2) Violation of Minnesota Patients Bill of Rights

Appellants contend that they asserted a viable negligence per se claim against Abbott based on Abbott's violation of a part of the Minnesota Patients Bill of Rights, Minn.Stat. § 144.651 (1996). Specifically, appellants contend that the relevant part of the Patients Bill of Rights required Abbott to ensure that appellants were informed that they were receiving investigational devices and gave their informed consents. Minn.Stat. § 144.651, subd. 13, provides:

> Written, informed consent must be obtained prior to a patient's or resident's *participation in experimental research.* Patients and residents have the right to refuse participation. Both consent and refusal shall be documented in the individual care record.

(Emphasis added.)

█ Here, appellants were not participants in experimental research. Consequently, we conclude that the cited subdivision of the Patients Bill of Rights is inapplicable to appellants' claims and affirm summary judgment on appellants' negligence per se claim alleging violation of the Patients Bill of Rights.[8]

### (3) Violation of Abbott's Internal Policies

█ Appellants also allege that Abbott was negligent in failing to comply with its own internal policy manual. The stated purpose of this manual is to establish guidelines and procedures "designed to protect the rights and welfare of human subjects involved in research and investigation conduct-

---

8. Abbott argues that we should affirm summary judgment in its favor on this claim because no private cause of action exists under the Patients Bill of Rights. Because we hold that section 13 of the Patients Bill of Rights is inapplicable to appellants as nonparticipants in experimental research, we need not determine whether the bill creates a private cause of action. *See Stubbs v. North Mem'l Med. Ctr.* 448 N.W.2d 78, 83 (Minn. App.1989) (noting, without deciding, that no private cause of action may exist under Patients Bill of Rights), *review denied* (Minn. Jan. 12, 1990).

ed at Abbott Northwestern Hospital." As previously noted, because appellants were not participants in research or investigations, Abbott's internal policy manual is inapplicable to them and their claims fail. We affirm summary judgment accordingly.

#### (b) Corporate Negligence and Fraudulent Concealment

Appellants argue that the district court erred by improperly granting Abbott summary judgment on their corporate negligence claim. Appellants contend that Abbott is liable on a corporate negligence theory for failing to ensure that appellants (1) were notified about the investigational status of the screw device and (2) gave their informed consents to the procedures.

The district court concluded that appellants failed to establish a prima facie case of corporate negligence for lack of evidence that Abbott failed to perform any of its nondelegable duties. We agree.

■ Generally, a physician has the duty to ensure that a patient gives informed consent. *See Kohoutek v. Hafner*, 383 N.W.2d 295, 299 (Minn.1986) (physician has a duty to disclose risks attendant to proposed or alternative methods of treatment the physician knew or should have known). Appellants cite several federal regulations in support of their claim that Abbott had a duty to inform them that use of the screw devices in their surgeries was investigational. *See, e.g.,* 21 C.F.R. § 812.5 (1996) (requiring investigational device to be labeled as such); 21 C.F.R. § 812.42 (1996) (requiring IRB and FDA to approve application before clinical investigation commences); 21 C.F.R. § 56.111 (1997) (listing prerequisites for IRB approval, including informed consent of prospective subjects). These regulations, however, apply only in the context of investigational studies; appellants were not involved in an investigational study. Moreover, even if appellants' surgeries were performed as part of an investigative study, Abbott would not have a duty to obtain the patient's informed consent. The federal regulations place the duty to obtain informed consent on the physician. *See* 21 C.F.R. § 812.100 (1996) (requiring "investigator" to obtain in-

formed consent). Accordingly, we conclude that the district court properly granted adverse summary judgment on appellants' corporate negligence claim.

Although appellants also pleaded a claim for fraudulent concealment based on Abbott's failure to inform appellants of the experimental nature of the screw devices, we agree with the district court that this claim is merely an "imaginative repackaging of [appellants'] allegation that the hospital failed to procure informed consent." Thus, we also conclude that it was proper for the district court to summarily reject appellants' fraudulent concealment claim.

#### 3. Strict Liability: Administrative Services

■ Appellants claim that the district court erred by granting summary judgment to Abbott on the strict liability in administrative services claim. Such a claim imposes liability on an ad hoc basis when it serves the public interest to hold a hospital strictly liable for supplying deficient administrative services. *Johnson v. Sears, Roebuck & Co.*, 355 F.Supp. 1065, 1067 (E.D.Wis.1973). But Minnesota courts have never recognized the doctrine of strict liability for administrative services, and, in our primary role as an error-correcting court, we decline to recognize this cause of action here. *See Fabio v. Bellomo*, 489 N.W.2d 241, 245 (Minn.App.1992) (error-correcting appellate court is hesitant to adopt new theories of law), *aff'd* 504 N.W.2d 758 (Minn.1993). Moreover, we note that even if we were to recognize such a cause of action, appellants have failed to present a prima facie case. Appellants contend that Abbott should be held strictly liable because it allowed a device to be used illegally within its facility. But we have decided that use of the screw device was lawful. Therefore, we conclude that the district court correctly granted summary judgment to Abbott on this claim.

#### DECISION

The district court correctly determined that use of the screw devices for spinal implants was lawful "off-label" use under the

FDCA, thus entitling Abbott to summary judgment on appellants' negligence claims. The district court properly granted adverse summary judgment on appellants' corporate negligence claim and fraudulent concealment claim because a physician, not a hospital, bears the burden of ensuring that a patient gives informed consent. Adverse summary judgment was also appropriate on appellants' claim for strict liability in administrative services, there being no such cause of action recognized in Minnesota, and even if there were, appellants failed to present a prima facie case.

**Affirmed.**

RANDALL, Judge (concurring specially).

I concur with the result reached by the majority. But I would have reached affirmance on the first issue, the statute of limitations. I find that issue dispositive in respondent's favor. I conclude the trial court erred, as a matter of law, in dismissing respondent's claims of a complete defense based on the two-year statute of limitations for medical malpractice actions. Respondent cross-appealed for review on this issue, and thus, it is a suitable basis to dispose of the entire lawsuit.

With the large amount of pedicle screws in the surgical stream of commerce across the country, and with the various other lawsuits arising from this same issue, I suggest it is essential to examine whether the shorter two-year statute of limitations applies or the generic six-year statute. Minn.Stat. §§ 541.05 (six-year), .07(1) (1996) (two-year).

As the majority points out, the district court followed *Kaiser* in coming to the conclusion that the six-year statute of limitations applied. *Kaiser v. Memorial Blood Ctr.*, 486 N.W.2d 762 (Minn.1992). I suggest that not only does *Kaiser* not support the six-year statute of limitations on this set of facts, but rather the logic and analysis of *Kaiser* compels a conclusion that the two-year medical malpractice statute of limitations applies.

The relevant lesson from *Kaiser* is that negligence committed by a person or entity acting pursuant to their professional licensure *is malpractice*, subject to the two-year statute of limitations, while negligence not committed under the authority of licensure, may be simple "common law" negligence, subject to the six-year statute of limitations.

Kaiser points out

blood banks are not expressly mentioned as a class of defendant governed by the two-year limitation in Minn.Stat. § 541.07(1).

*Kaiser*, 486 N.W.2d at 766. That is in direct contrast with this case, because respondent, a hospital, falls squarely within the two-year medical practice statute of limitations for

all actions against physicians, surgeons, dentists, other health care professionals * * * [and] hospitals * * * for malpractice, error, mistake or failure to cure, whether based on contract or tort.

Minn.Stat. § 541.07(1). *Kaiser* states in relevant part:

The term "professional service," defined in Minn.Stat. § 145.61, subd. 3, included in the definition of "health care" in Minn.Stat. § 145.61, subd. 4, which together form the statutory source for determining what "other health care professionals" are covered by the two-year statute of limitations, refers to "service[s] rendered by a professional *of the type such professional is licensed to perform.*" *Id.* § 145.61, subd. 3 (Emphasis added.) There is thus a distinction between malpractice by professionals acting pursuant to their professional licensure from negligence based upon conduct for which a professional license is not required.

*Kaiser*, 486 N.W.2d at 767 (footnote omitted).

Hospitals, like physicians and surgeons, *are licensed.* As a result, negligently operating under authority of their licensure subjects hospitals, like physicians, to medical malpractice lawsuits, and thus hospitals are entitled to the two-year statute of limitations.

Further, in *Kaiser*, the plaintiff's case was found to be "about the administrative and standard-making functions of the blood bank industry for which a physician's or nurse's professional license is not required." *Kaiser*, 486 N.W.2d at 768.

Here, the inescapable fact is that this lawsuit sounds in medical malpractice, not "standard-making functions" of an unlicensed entity. Appellants' claims include allegations of negligent nondisclosure, negligence in failing to prevent surgeons from implanting pedicle screws in appellants, and negligence in failing to get the patients' informed consent before using medical devices still in the experimental stage. Those allegations are medical malpractice allegations against the hospital from start to finish.

This case would have been pleaded as a straight-forward malpractice case against the hospital and would have included claims against the operating surgeons, *if* the plaintiffs had sued within two years of the time their claims accrued. Because appellants failed to sue within the statutory period for malpractice, they are circumventing the two-year statutory period by "splitting a cause of action," naming just the hospital as a defendant, instead of both the hospital and the surgeons, and alleging medical negligence against the hospital, but calling it "administrative negligence."

The philosophical question of whether medical professionals are entitled to the shorter two-year period of limitations, as opposed to other professions which generally are under the six-year statute, is not before us.

I conclude that *Kaiser* is controlling. This case is a medical malpractice claim against a hospital operating under its licensure. The allegations, among others, of lack of informed consent, allowing insertion of improper medical devices, and negligent disclosure are straight-forward malpractice allegations. Accordingly, I conclude the district court erred by not dismissing appellants' claims against respondent hospital as time-barred as a matter of law.

PETERSON, Judge.

I join in the concurrence of Judge Randall.