Arthur FRY

v.

ALLERGAN MEDICAL OPTICS et al.

No. 95–221–Appeal.

Supreme Court of Rhode Island.

June 19, 1997.

Stephen J. Dennis, Providence, for Plaintiff.

Brooks R. Magratten, George Vetter, Providence, for Defendant.

Pamela A. Liapakis, New York City, Jeffery Robert White, Falls Church, Hugh F. Young, Reston, Gerald C. DeMaria, Providence, Kenneth S. Guller, Alan E. Untereiner, Washington, DC, for Amicus Curiae.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, JJ.

## OPINION

BOURCIER, Justice.

In this appeal Arthur Fry (plaintiff) appeals from a final judgment following an entry of summary judgment in favor of Allergan Medical Optics (Allergan or defendant). The Superior Court trial justice found that the plaintiff's state law claims challenging the safety of a medical device manufactured by Allergan were preempted by federal law and it was therefore entitled to judgment as a matter of law. We affirm.

### FACTS AND TRAVEL

In March of 1990 the plaintiff, a seventy-two-year-old retired United States Army sergeant, with a history of chronic eye problems, including a detached retina, glaucoma, and cataracts, underwent eye surgery at Kent County Memorial Hospital because of a cataract that had formed in his left eye and occluded his vision. To alleviate this condition, plaintiff's ophthalmologist removed the natural lens from plaintiff's eye and implanted an AC–21B Anterior Chamber Intraocular Lens (the lens) manufactured by Allergan. The lens was designed to rest behind the eye's pupil and iris and to serve the function of a natural lens.

Despite plaintiff's hopes for improved vision, the lens implanted in his eye became dislocated twice, was repositioned surgically, and ultimately had to be removed. Because of problems associated with the dislocation and removal of the lens, plaintiff now contends that he suffers from chronic eye pain and has endured a loss in visual acuity.

On April 13, 1993, plaintiff filed a civil action complaint in the Superior Court in which he named eight medical-device manufacturers as defendants. He sought damages based on claims for negligence, strict liability, and breach of warranties, both express and implied.[1] As the case proceeded

---

1. Count 1 of the two count complaint alleged that "defendant, its agents, servants and employees, were negligent in furnishing to plaintiff and the plaintiff's said medical providers a[n] AC–21B anterior chamber intraocular lens implant which was defective, in a poor state of repair, and not reasonably suited for its intended use * * *." Count 2 alleged defendant "expressly

and impliedly warranted to plaintiff's medical providers and to the plaintiff that said product was merchantable both expressly and impliedly and fit for the particular purpose for which it was intended[,] * * *" and that "defendant breached said expressed and implied warrant[ies] and that the AC–21B anterior chamber intraocular lens implant was and at all times

through the pretrial process, it was discovered that none of the various defendants named in the complaint had manufactured or sold the lens in question. By consent of all the parties, the Superior Court on February 13, 1995, dismissed all claims against the originally named defendants but permitted the plaintiff to amend his complaint and to substitute the proper defendant, Allergan, the actual manufacturer of the lens.

Allergan thereafter moved for summary judgment, asserting that 21 U.S.C. § 360k(a) of the Medical Device Amendments (MDA) to the Federal Food, Drug and Cosmetic Act preempted the plaintiff's state law claims. *See* 21 U.S.C. § 360k(a). After hearing thereon, a justice of the Kent County Superior Court granted Allergan's motion for summary judgment. The hearing justice, relying upon the holding in *King v. Collagen Corp.*, 983 F.2d 1130 (1st Cir.1993), found that the MDA preempted any and all state law claims against the manufacturer of a Class III medical device regulated by the MDA. She entered summary judgment in Allergan's favor. The plaintiff appeals from the final judgment entered thereon.

## THE MEDICAL DEVICE AMENDMENTS

The MDA were enacted in 1976 as amendments to the Federal Food, Drug and Cosmetic Act and were enacted partly as a legislative response to public concern for the safety of medical devices. *See Medtronic, Inc. v. Lohr*, —— U.S. ——, ——, 116 S.Ct. 2240, 2246, 135 L.Ed.2d 700, 710 (1996). The MDA grants jurisdiction over medical devices to the Food and Drug Administration (FDA) and creates three classifications of medical devices on the basis of the level of public risk represented by a particular device. 21 U.S.C. § 360c. Class I devices, which include tongue depressors and ice bags, consist of devices posing the lowest level of risk and are subject only to "general controls." 21 U.S.C. § 360c(a)(1)(A). Class II devices, which include hearing aids and syringes, are moderately regulated through "special controls." 21 U.S.C.

§ 360c(a)(1)(B). Class II devices, however, like Class I devices, may be marketed without advance approval from the FDA. Last, the MDA creates the category of Class III medical devices, the category in which the AC–21B Anterior Chamber Intraocular Lens is included. 21 U.S.C. § 360c(a)(1)(C).

Class III medical devices consist of those devices that are important for sustaining human life and well-being but which may, notwithstanding, present a potentially unreasonable risk of illness or injury. The FDA general controls regarding those devices cannot by themselves ensure their safe use or safety because of the absence of existing available and sufficient use and testing data to establish any performance standard from which these devices' safety might be measured. As a result before permitting a manufacturer to market a Class III device, the FDA requires that the device, unless otherwise exempted, undergo "premarket approval." 21 U.S.C. § 360e(a). The premarket approval process involves a rigorous review by the FDA of the ingredients, components, manufacturing methods, and proposed labeling of the medical device in question. 21 U.S.C. § 360e(c)(1)(A)–(G). The average time required for the FDA to review each application for premarket approval is 1,200 hours. However, even upon receipt of premarket approval the FDA retains the authority to withdraw or to suspend its prior approval upon a finding that the medical device no longer demonstrates a reasonable assurance of safety. 21 U.S.C. § 360e(e)(1)(A)–(B). Additionally, after initial approval of a device any changes in its labeling or manufacturing that might affect the safety or effectiveness of the medical device require prior FDA approval. 21 U.S.C. § 360e(e)(1)(B), (E); 21 C.F.R. § 814.39(a) (1996).

Congress, in its legislation, also created two exemptions to the premarket approval process. First, devices created prior to 1976 that were already in the stream of commerce are "grandfathered" until the FDA initiates and completes the premarket approval process. 21 U.S.C. § 360e(b)(1)(A). Second, devices that are considered "substantially

---

material hereto, was defective and not fit for [the] particular purpose for [which it] was dis-

tributed and sold without proper labels or warnings or instructions."

equivalent" to grandfathered devices are granted approval without premarket approval. 21 U.S.C. § 360e(b)(1)(B).

## ANALYSIS

There is no dispute in this case regarding the fact that the lens at issue here is a Class III medical device and that it was approved for manufacture and distribution after undergoing the rigorous premarket approval process. The application for premarket approval was submitted for the lens on July 3, 1987 and was considered by the FDA for some two years before finally being granted on September 29, 1989. The appeal in this case focuses on the extent to which the MDA, a federal law, and part of the FDA regulatory program preempts the plaintiff's state law claims.

It is clear that federal preemption of state law is a matter of federal constitutional law. The supremacy clause of Article VI of the United States Constitution directs that federal law "shall be the supreme law of the land; and the judges in every state shall be bound thereby * * *." U.S. Const. Art. VI, cl. 2. This clause creates a scheme in which, if Congress intends, state laws may be preempted by federal law and will be considered to be " 'without effect.' " *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422 (1992) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576, 595 (1981)); *see also Narragansett Electric Co. v. Burke*, 119 R.I. 559, 564, 381 A.2d 1358, 1361 (1977). The intention to preempt state law may arise explicitly from the language employed in the statute or implicitly from the statute's structure and purpose. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157, 167 (1992). The defendant here relies upon the express language of the MDA in asserting that plaintiff's state law claims are preempted.

Beyond creating an expansive regulatory scheme for medical devices, Congress provided for preemption of state and local laws by enacting 21 U.S.C. § 360k(a), upon which defendant relies. That section provides:

"[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter."

By the language employed Congress clearly intended to preempt state "requirements" when they are different from or add to federally imposed "requirements."

The defendant contends here that a state court judgment on plaintiff's state law claims would in effect establish requirements that would be "different from, or in addition to" the FDA requirements established through the premarket approval process. The plaintiff, on the other hand, asserts that Congress did not intend either the premarket approval process or judgments rendered on state law claims to be considered requirements for purposes of § 360k(a) of the MDA. In support of his contention plaintiff points to certain FDA regulations narrowly interpreting the preemptive scope of § 360k(a). Those regulations state:

"State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. There are other State or local requirements that affect devices that are not preempted by [§ 360k(a)] of the act because they are not 'requirements applicable to a device' within the meaning of [§ 360k(a)] of the act. The following are examples of State or local requirements that are not regarded as preempted by [§ 360k(a)] of the act:

"(1) [§ 360k(a)] does not preempt State or local requirements of general applicability where the purpose of the requirement

relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.

"(2) [§ 360k(a)] does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act." 21 C.F.R. § 808.1(d)(1), (2) (1996).

In addressing the parties' contradictory interpretations of 21 U.S.C. § 360k(a) of the MDA, we are cognizant that the issue presented as a result of those differing interpretations has been vigorously contested in the federal courts. Both Federal Circuit Courts and District Courts have wrestled with the congressional language employed in 21 U.S.C. § 360k(a) of the MDA and the accompanying FDA regulations without reaching any clear consensus. *Compare Kennedy v. Collagen Corp.,* 67 F.3d 1453 (9th Cir.1995) (holding that 21 U.S.C. § 360k(a) of the MDA does not preempt state law causes of action against manufacturers of Class III devices because state law actions are not requirements); *Ministry of Health, Province of Ontario, Canada v. Shiley Inc.,* 858 F.Supp. 1426 (C.D.Cal.1994) *with King v. Collagen Corp.,* 983 F.2d 1130 (1st Cir.), *cert. denied,* 510 U.S. 824, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993) (holding that 21 U.S.C. § 360k(a) of the MDA preempts state strict liability, negligence, and breach of express and implied warranty causes of action against Class III medical device manufacturers because state law actions as well as FDA regulations are requirements under the MDA); *Covey v. Surgidev Corp.,* 815 F.Supp. 1089, 1094 (N.D.Ohio 1993).

The hearing justice below examined the conflicting case law and decided, relying upon *King v. Collagen Corp.,* 983 F.2d 1130 (1st Cir.1993), that 21 U.S.C. § 360k(a) preempted plaintiff's state law claims. In *King* the court determined that state law judgments imposed additional or different requirements for purposes of the MDA and also that state court judgments on claims of strict liability, negligence, and breach of express and implied warranties imposed additional or different requirements applicable to the particular device under the statute. *Id.* at 1135–36.

Subsequent to the decision by the trial justice in this case, however, the United States Supreme Court in a plurality opinion addressed the intended scope of MDA preemption in *Medtronic, Inc. v. Lohr,* —— U.S. ——, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). In *Medtronic* the plaintiff, Lora Lohr, was the recipient of a Model 4011 pacemaker, a Class III medical device. The pacemaker had received FDA approval as a device "substantially equivalent" to a preexisting medical device and was thus exempted from pre-market approval. *Id.* at ——, 116 S.Ct. at 2248, 135 L.Ed.2d at 712. The pacemaker failed and allegedly resulted in "complete heart block" that required emergency surgery. *Id.* at ——, 116 S.Ct. at 2248, 135 L.Ed.2d at 713. Thereafter the recipient and her husband filed a civil action for damages in Florida State Court, relying upon state law theories of negligence and strict liability. *Id.* After the case was removed to the Federal District Court, Medtronic moved for summary judgment, relying on preemption under the MDA. That motion was granted, and later the Court of Appeals for the Eleventh Circuit affirmed in part and reversed in part and remanded the case to the District Court. The Supreme Court then granted Medtronic's petition for certiorari.

After a lengthy examination of the history of the MDA and its three classifications of medical devices, a majority [2] of the justices, although affirming in part, reversing in part, and remanding, determined that Congress intended preemption "only where a particular state requirement threatens to interfere with *a specific federal interest.*" *Medtronic,* —— U.S. at ——, 116 S.Ct. at 2257, 135 L.Ed.2d at 724. (Emphasis added.) These majority justices went on to conclude that the approval process for medical devices

---

**2.** This majority consisted of the opinion of Justice Stevens in which Justices Kennedy, Souter, and Ginsburg joined and the opinion of Justice Breyer in which he concurred in part and dissented in part. Justice O'Connor filed an opinion concurring in part and dissenting in part, in which Chief Justice Rehnquist and Justices Thomas and Scalia joined.

found to be "substantially equivalent" to preexisting medical devices was not a specific federal interest that rose to the level of a requirement under the language of the MDA. The Court reasoned that the process "reflect[ed] important but entirely generic concerns about device regulation generally, not the sort of concerns regarding a specific device or field of device regulation which the statute or regulations were designed to protect from potentially contradictory state requirements." *Id.* at ——, 116 S.Ct. at 2258, 135 L.Ed.2d at 725. Furthermore the approval process for the pacemaker was not a requirement because the FDA "did not require Medtronics' pacemaker to take a particular form for any particular reason, the agency simply allowed the pacemaker, as a device substantially equivalent to one that existed before 1976, to be marketed without running the gauntlet of the [premarket approval] process." *Id.* at ——, 116 S.Ct. at 2254, 135 L.Ed.2d at 721. On this point, it is interesting to note, the entire Court agreed. *See id.* at ———, 116 S.Ct. at 2263–64, 135 L.Ed.2d at 733 (O'Connor, J., concurring in part and dissenting in part). The entire Court also agreed that insofar as the plaintiffs' claims sought to enforce the exact regulations imposed upon the Medtronic pacemaker by the FDA, those claims did not impose different or additional requirements upon Medtronic and were not preempted under 21 U.S.C. § 360k(a). "Nothing in § 360k denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." *Id.* at ——, 116 S.Ct. at 2255, 135 L.Ed.2d at 721.

The Court divided, however, on the question of whether state law claims of general applicability were additional requirements under 21 U.S.C. § 360k(a) of the MDA when such duties were not imposed by the FDA itself. Four justices of the Court decided that such common law causes of action were not requirements as that term is used in the MDA. Those justices concluded that only state laws enacted with respect to a particular device were the type of state law requirement that the MDA sought to preempt. *Id.*

at ——, 116 S.Ct. at 2253, 135 L.Ed.2d at 721. The majority of the Court, however, through two different opinions,[3] determined that state claims seeking to impose general common law duties were additional requirements under 21 U.S.C. § 360k(a) of the MDA because they threatened to impose different or additional burdens on the manufacturer. *See id.* at ————, 116 S.Ct. at 2259–60, 135 L.Ed.2d at 727 (Breyer, J., concurring in part and concurring in the judgment); *see also id.* at ——, 116 S.Ct. at 2263, 135 L.Ed.2d at 731 (O'Connor, J., concurring in part and dissenting in part).

Though fractured, the *Medtronic* decision offers ample guidance concerning the appropriate preemption analysis to be employed when construing the effect of 21 U.S.C. § 360k(a) of the MDA upon plaintiff's claims in this case. It is with those teachings in mind that we take up our analysis. We begin by recognizing that in this action, unlike *Medtronic*, defendant's lens underwent a rigorous premarket approval process that extended over a two year period. As noted earlier, this process involved a review of all the ingredients, components, manufacturing methods, and labeling to be used in conjunction with the lens. Furthermore, from the time of premarket approval in September 1989 and continuing thereafter to the present time, defendant was prohibited from making any changes in its labeling, manufacturing, or use of ingredients employed in producing the lens if any of those changes would affect the safety of the lens. We think rather than expressing entirely generic concerns of safety, the FDA has expressed explicit concerns toward this lens. We conclude that the premarket approval process constitutes a specific federal interest as contemplated in *Medtronic* and that, therefore, the FDA approval served to impose strict FDA requirements upon the defendant. Other courts have reached similar conclusions in the wake of *Medtronic*. *See Berish v. Richards Medical Co.*, 937 F.Supp. 181, 185 (N.D.N.Y.1996); *Armstrong v. Optical*

---

3. This majority consisted of the opinion of Justice Breyer and the opinion of Justice O'Connor in which Chief Justice Rehnquist and Justices Scalia and Thomas joined.

*Radiation Corp.,* 50 Cal.App.4th 580, 57 Cal. Rptr.2d 763, 771 (1996).

■ Having determined that the FDA has imposed requirements upon the defendant, we turn now to consider whether the plaintiff's state law claims are requirements under the MDA. As the majority of the Court decided in *Medtronic,* we conclude that plaintiff's state law claims amount to the imposition of additions to federal requirements under the MDA because those claims would impose different or additional duties upon the defendant in the form of a court judgment. We also conclude, however, in accordance with *Medtronic,* that if the plaintiff's state law actions were premised upon the failure of a manufacturer to comply with requirements imposed by the FDA, those claims would not be preempted by the MDA because they would not impose different or additional requirements but would instead merely enforce the exact requirements imposed by federal law.

In the instant case the plaintiff sought recovery under theories of negligence, strict liability, and breach of warranty. Clearly then, insofar as these claims threaten to impose different or additional burdens on the defendant, the MDA preempts them. On appeal, the plaintiff suggests that the defendant may have violated FDA imposed regulations, thus exempting his claims from preemption. The posture of the instant appeal prevents this Court from permitting the plaintiff to pursue this newly articulated legal theory. We note that at the hearing below on the defendant's summary judgment motion, the plaintiff failed to delineate any alleged deviation by Allergan from any FDA regulations but rather asserted only broad general claims of negligence, strict liability, and breach of express and implied warranties. *See ante* n. 1. Those claims, as we have stated, are preempted under federal law, and

the trial justice on the facts before her so found. The plaintiff could not resist summary judgment by simply resting on his case pleadings, he bore the burden of "showing that there [was] a genuine issue for trial." *See* Super.R.Civ. P. 56(e). Since he failed to demonstrate any such issue by showing any deviation by Allergan from the federal regulations imposed upon Allergan; summary judgment was properly granted in Allergan's favor.[4] *See Grissom v. Pawtucket Trust Co.,* 559 A.2d 1065 (R.I.1989); *see also Mastrangelo v. Howmedica, Division of Pfizer Hospital Product Group,* 903 F.Supp. 439, 444 (E.D.N.Y.1995); *Mallad Construction Corp. v. County Federal Savings and Loan Association,* 32 N.Y.2d 285, 344 N.Y.S.2d 925, 298 N.E.2d 96 (1973).

The plaintiff's appeal is denied and dismissed, the final judgment is affirmed, and the papers in this case are remanded to the Superior Court.

GOLDBERG, J., did not participate.

---

4. Throughout the pretrial discovery process, the plaintiff failed to articulate any deviation from federal regulations. The plaintiff's responses to interrogatories were elusive at best. For example, the plaintiff was requested on three occasions to explain how the lens was defectively manufactured. He responded in October 1993 and November 1993 that the request was overly broad and overly burdensome. After the defen-

dant's third request for this information, the plaintiff responded in February of 1994 that the "[l]ens had to be repositioned twice and finally removed." That response, without other supporting documentation or explanation, was insufficient to support a claim that the lens implanted in the plaintiff's eye deviated from federal requirements.